ERMA L. ROBERTSON *et al.*, Plaintiffs-Appellants, *v.* ORVILLE J. RO-BERTSON *et al.*, Defendants-Appellees.

Fifth District   No. 83—64

Opinion filed March 27, 1984.—Supplemental opinion filed on denial of rehearing May 9, 1984.

Douglas Marti, of Greenville, for appellants.

Joseph R. Brown, Jr., of Mudge, Riley & Lucco, of Edwardsville, for appellees.

JUSTICE KARNS delivered the opinion of the court:

Plaintiffs are defendant Orville J. Robertson's former wife from his second marriage and their five children. They appeal from a judgment of the circuit court of Montgomery County, sitting without a jury, denying in its entirety their claim brought to set aside certain conveyances which were alleged to have prevented them from collect-

ing the full amount of another judgment of the same court for child support. The complaint filed by the plaintiffs in the present suit alleged, *inter alia*, fraudulent conduct on the part of each defendant in a series of title transfers, two of which occurred before and two of which occurred after the parties were divorced, so as to defeat Erma's marital rights. Each disputed conveyance relates to an approximately 48-acre parcel of land located in Montgomery County.

Defendant Clara A. Robertson is Orville's mother. She was unable to testify in the instant proceeding because of incompetency. Defendant Helen V. Robertson is Orville's first and current wife with whom he resides in El Paso, Texas. She presently holds record title to the property in question except for two lots which she holds in joint tenancy with defendants Geneva and Everett Neathery, Orville's sister and brother-in-law.

Defendants' motion to dismiss this appeal was taken with the case and is based on plaintiffs' alleged failure to file a timely notice of appeal. The parties have argued various points relating to the nature and effect of a record sheet entry made by the trial court dated August 25, 1982. Defendants contend that the entry is a final judgment from which an appeal must have been prosecuted within the time limit set out in Supreme Court Rule 303 (87 Ill. 2d R. 303), and plaintiffs' failure to do so requires dismissal of this appeal. Plaintiffs contend that the entry was not a final judgment and, even if it were, the facts of this case warrant special consideration to permit their right to appeal nonetheless.

The trial court took the case under advisement following a trial on the merits in April 1982. Briefs were submitted in May and June. The disputed record sheet entry reflects that reasoned consideration was given to testimony, exhibits, briefs and arguments of counsel. After almost three years of protracted litigation, the court concluded: "[T]he Plaintiffs [*sic*] claim is denied in its entirety at the plaintiffs [*sic*] cost; clerk to notify counsel of courts [*sic*] decision." Immediately following this entry, dated August 25, 1982, is the following entry: "12/28/82 Copies sent."

On January 17, 1983, plaintiffs filed a motion to vacate and reenter judgment alleging that neither counsel had any knowledge whatsoever of the court's decision of August 25 until after the clerk sent copies on December 28. A hearing on plaintiffs' amended motion to vacate was held on January 24, 1983. Counsel for plaintiffs filed a supporting affidavit and a stipulation which recited the lack of notice. The parties also agreed that plaintiffs' counsel made several attempts in September and thereafter to determine the status of the case. Fol-

lowing arguments of counsel, the court denied plaintiffs' motion. Plaintiffs' notice of appeal was filed January 26, 1983, and was directed to the August 25 and January 24 orders.

While plaintiffs question the finality of the August 25 order, the words used by the court make it clear in whose favor the judgment was entered, and it terminated the litigation.

■ While the order of the court was brief, lacking in form and not a model of clarity, it nevertheless bears sufficient *indicia* to indicate that the court was entering a final order. The order recited that plaintiffs' "claim is denied in its entirety." We think the denial of a "claim" is to be equated with the dismissal of a "cause" or a "cause of action," both of which terms have been found to be sufficient to denote finality in an order. (*Williams v. A.E. Staley Manufacturing Co.* (1980), 80 Ill. App. 3d 981, 400 N.E.2d 724; *Bates v. Ulrich* (1976), 38 Ill. App. 3d 203, 347 N.E.2d 286; *Kita v. YMCA* (1964), 47 Ill. App. 2d 409, 198 N.E.2d 174.) Additionally, the order assessed costs against the plaintiffs, an event that generally accompanies the entry of a judgment or final order. The court's omission of proper possessive case apostrophes does not create any ambiguity, as alleged. Each plaintiff's claim was the same and each one was implicitly denied. Supreme Court Rule 304 (87 Ill. 2d R. 304) is inapplicable. Nor does omission of the words "order," "adjudged," or "decreed" affect the validity or finality of the judgment. Further, plaintiffs have cited no Illinois authority to support their theory requiring the signature rather than the initials of the judge to render the judgment effective. No statute or Supreme Court Rule provides for a judicial signature or initials to a judgment and, indeed, Supreme Court Rule 272 (87 Ill. 2d R. 272) gives express recognition to the fact that a final judgment may be rendered without the signature of the judge. In any event here there is no dispute about who entered the August 25 judgment on the record sheet. The judge's initials appear beside the entry. In short, plaintiffs' arguments attacking the form of the judgment are without merit. The order terminated the litigation between the parties on the merits of the cause so as to leave no doubt the order was a final judgment. *Flores v. Dugan* (1982), 91 Ill. 2d 108, 435 N.E.2d 480; see *Village of Niles v. Szczesny* (1958), 13 Ill. 2d 45, 48, 146 N.E.2d 371, 372, and cases cited therein.

■ Supreme Court Rule 303(a) provides that "the notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely post-trial motion directed against the judgment is filed, whether in a jury or a nonjury case, within 30 days after the entry of the order dis-

posing of the motion." (87 Ill. 2d R. 303(a).) The record does not establish lack of diligence on the part of plaintiffs' attorney. To the contrary, the parties agreed that plaintiffs' counsel made several attempts in September and thereafter to determine the status of the case, although the nature of those attempts is not described. The case was taken under advisement some months before the judgment was entered. Both parties could expect notification of the court's judgment. The court directed the clerk to send copies of the judgment. Through no fault of either side, both learned of the judgment four months after its entry. These facts bring the case within the rule explained and relied upon in our case of *Commonwealth Loan Co. v. Baker* (1966), 67 Ill. App. 2d 359, 214 N.E.2d 904, that a judgment is not rendered until such time as it is rendered in public *situs* of the case. The *Commonwealth Loan* case followed, in part, the supreme court case of *People ex rel. Schwartz v. Fagerholm* (1959), 17 Ill. 2d 131, 161 N.E.2d 20, an opinion that predated the adoption of Rule 272. The *Fagerholm* case, in discussing where, when and how a judgment or decree was entered, held that the judge's decision in a case must be expressed publicly, in words, and at the *situs* of the proceedings before it will be considered a rendition of a judgment. At the time the case was decided, a judgment at law became effective when it was orally pronounced in court. In equity, the mere oral pronouncement of the decision was of no effect until the decree was reduced to writing, approved by the chancellor and filed for record. The time and manner of entry of a decision in a declaratory judgment action was made to depend upon whether the requested relief was legal or equitable in nature. Supreme Court Rule 272 was adopted to make uniform the rendition of decisions in actions both legal and equitable. However, the Rule addressed only the time and manner of entry of a final judgment, whether at law or in equity. Thus, Rule 272 made no change in the *Fagerholm* rule that a judgment must be rendered in public at the *situs* of the case. In the case under consideration there is no question under Rule 272 that the manner of rendition of the judgment was by a record sheet (docket) entry and that no written judgment was to be prepared and submitted.

 *Commonwealth Loan Co. v. Baker* (1966), 67 Ill. App. 2d 359, 214 N.E.2d 904, was a garnishment action by a judgment creditor to reach funds of a debtor allegedly held by his employer. A hearing was held on July 9. The judge took the case under advisement and took the docket sheet and court file into his chambers, where they remained until November 5 or 6. It was undisputed that plaintiff's attorney made inquiry of the clerk on several occasions to determine

whether there had been any decision in the case, always to learn that the file and docket sheet had not been returned. Finally, on November 5 the attorney contacted the judge concerning the case, and on that day or the next the file and docket sheet were returned to the clerk's office. It was then that plaintiff's attorney learned that judgment had been entered against his client by an entry on the docket sheet made by the judge on July 22. It was further learned that the garnishee-defendant, defendant's employer, had somehow learned of the judgment and after 30 days had delivered the funds in question to the defendant. The garnishee-defendant moved against plaintiff's appeal because the notice of appeal had not been filed within 30 days after the entry of the judgment. This court, following the *Fagerholm* case, held that the judgment had not been rendered until November 5 or 6 when the court file and docket sheet had been returned to the clerk's office and thereby made public. We stated:

> "A clerk has no more license or duty to invade the privacy of the Judge's Chambers to determine if judgment has been rendered, than have counsel for the litigants. *** The rendering of a judgment is not and must not be a secret process, it must be a public act. To hold otherwise would destroy public confidence in the entire judicial system." 67 Ill. App. 2d 359, 367, 214 N.E.2d 904, 908.

The facts of the case under consideration make the *Commonwealth Loan* case particularly apt. Here, the plaintiffs' attorney made several attempts in September and thereafter to determine the status of the case, to no avail. It appears from the record that neither of the parties had any knowledge of the August 25 judgment until the clerk, on December 28, sent copies to them. From those facts and from the requirement of sections 14 and 15 of "An Act to revise the law in relation to clerks of courts" (Ill. Rev. Stat. 1981, ch. 25, pars. 14, 15) (circuit clerk is required to enter of record all judgments as soon after rendition as practicable and is to be adjudged guilty of a petty offense for his failure to do so within 45 days from rendition), we presume that the judgment of August 25 was not made public, and accordingly not rendered, until on or shortly before December 28, the date the notices were sent by the clerk as directed by the judgment. Accordingly, the judgment was not effective for purposes of appeal until its rendition and entry were pronounced by the court through the clerk's notice on December 28. After learning in January that judgment had been entered, plaintiffs filed their post-trial motion.

For the foregoing reasons we believe plaintiffs have filed a timely notice of appeal after the denial of their post-trial motion which was

filed within 30 days after the August 25 judgment which became effective, or was entered, on December 28, 1983.

Orville and Helen Robertson were married in 1936 and had 10 children between 1936 and 1959. They have never been divorced. Orville and Erma Robertson were married in 1959 and had five children between 1956 and 1964. Between 1956 and 1964 it appears that Orville was living occasionally with each family. His employment as a traveling salesman and preacher oftentimes required him to be away from both families. After October 1964, Orville's visits with Erma came only weeks, sometimes months, apart. He continued his periodic living arrangement with Helen, although he did not stay with her permanently until several years later.

In September 1965, Orville, as sole record owner, conveyed his entire interest in the subject property to his mother, Clara, for the recited consideration of one dollar. In September 1966, Clara executed a quitclaim deed to herself and Helen as joint tenants for the recited consideration of one dollar.

In July 1967, Orville filed a complaint for divorce against Erma in the circuit court of Montgomery County. Erma counterclaimed alleging desertion. A hearing followed in December of that year and Orville was ordered to pay temporary support in the amount of $285 per month. He paid temporary support for nearly two years totaling $5,530. Nevertheless, at the final divorce hearing in October 1969, he was found to be in arrears $740 and adjudged to be in contempt and sentenced to a six-month jail term. The court found that Orville and Erma had been lawfully married and that Orville had wilfully deserted Erma during October 1964. Erma was granted a divorce on that basis. Additionally, the court increased Orville's support obligation to $500 per month. His support payments did not continue after the divorce was granted.

From 1966 to 1977, the subject property remained held jointly by Clara and Helen. In July 1977, Clara executed a quitclaim deed of her remaining interest to Helen for the consideration of "One and other Dollars." Five months later, Helen executed a warranty deed conveying two lots of the parcel to the Neatherys, who paid $17,500 for them.

Several hearings were held in early 1979 regarding Orville's 10-year arrearage. He was sentenced and jailed for contempt. Judgment was entered against him in the amount of $44,772.60 for past-due child support in favor of Erma. The amount was reduced by $2,000 for money paid to Erma, and Orville was released from jail.

The instant complaint was filed in November 1979. In their

amended complaint, plaintiffs alleged that their cause of action was based upon the facts and circumstances of the above described conveyances, knowledge of which they first acquired at a series of hearings in early 1979. The cause was tried in November 1981, by the court sitting without a jury. Additional evidence was presented in April 1982, and the court granted leave to file briefs. On August 25, 1982, the circuit court denied plaintiffs' claim in its entirety.

Plaintiffs bring this appeal praying that each conveyance be declared void or, that the record titleholders be declared to hold title only as trustees for the benefit of plaintiffs and that the premises be sold to satisfy the balance due on the judgment for child support or, that Helen be ordered to pay to plaintiffs the proceeds from the sale of the two lots to the Neatherys or, finally, that this cause be remanded for a new trial or for the taking of additional evidence.

Title to the subject property was acquired by Orville in 1961 when Clara and his sisters conveyed their interests in the property to him. When asked why he transferred the property to his mother in 1965, Orville responded, "[S]he like the rest of them I had borrowed money from her and I owed it to her." He testified that he owed her as much as or more than the value of the land. Clara paid nothing, although the property was appraised to be worth between $6,000 and $8,250 at that time. He testified that there were no agreements as to how Clara was to treat the property nor any tacit understanding that she was to hold it for his benefit or that the transfer was restricted in any way. In fact, he testified, he never discussed the transfer with her prior to the conveyance. He also testified he never discussed the transfer with Helen. He testified he did not pay taxes on the property after 1965. Asked if he conveyed the property to Clara for purposes of avoiding child support, Orville responded that he did not and added, "I did not even know there was such a thing that was hanging over me at the time." Further, he testified that at the time of this conveyance he intended to continue to provide support to Erma and her children but thereafter simply did not have enough to go around.

The record establishes that before the transfer to Clara, Orville also owned his home, subject to a mortgage, in El Paso. At approximately the same time he conveyed his real estate interest in Montgomery County to his mother, he also attempted to transfer ownership of his El Paso home to his son by his first marriage. According to Orville, he was not afraid that Erma would be able to make any claim to this property, but stated simply, "I could not make the payments on the house"; however, Orville continued to appear as the record owner, and the tax bill still is sent to his home address. Orville

admitted that at the time of these two transfers, these properties were the only assets he had. He had no substantial income from 1964 to 1966 though he worked occasionally.

Regarding the 1966 conveyance from Clara to Helen, Orville testified that neither of them ever mentioned it to him before it occurred. He could think of no reason for the transfer "other than because Helen was like a daughter to her and *** she felt like if anything happened to her that it was, it was her wish that Helen have it, I guess." He testified that he did not know about Clara's conveyance to Helen until after he resumed living with Helen after leaving Erma. He said he never really discussed the matter with his mother since "that was her business, it wasn't mine ***." Helen testified that she paid no value for this joint interest nor could she offer any explanation for the transfer aside from pure love and affection. She testified that she knew nothing about it until after it happened and that there was no prior conversation with Clara regarding any possible interest that Orville may have had in the future. Helen stated that she did not pay real estate taxes on the property from 1966 to 1977 nor was she ever requested by Clara to do so. She did not receive any of the income from the ongoing sharecrop arrangement during that period.

Orville testified about the temporary support that was paid to Erma between 1967 and 1969. Some of it was paid by him and some of it was borrowed from members of his family. Orville testified that he recognized his obligation to support, both before and after the divorce decree, and that if he could have paid support after the decree he would have. "I had borrowed money and just about done everything that I could to keep the family above the water and it just reached the point that I couldn't do it any more and there was no way that I could."

Indeed, the record establishes that during this entire period Orville was in dire financial straits. He had suffered a serious heart attack in 1963 and another in 1971. His annual income in 1964 through 1966 was not substantial, though he worked some. He was trying to support two families on an annual income of $4,500 in 1967 through 1969. In 1970 and 1971 he received income of no more than a few thousand dollars. To date, regular income in his name amounts to about $300 per month in disability pay.

Orville testified that from the time Helen received complete title to the subject real estate in 1977, she has been receiving income from a sharecrop arrangement estimated to be about $500 per year. Helen testified likewise. The money is deposited in a joint account that includes Orville's name. The account is used for household expenses

from which expenditures he benefits, although the account is managed by Helen who writes most of the checks. Plaintiffs introduced evidence establishing that Orville had written checks on this account as well as an account kept in Montgomery County from which money was drawn to improve the property and pay taxes there.

As in the case of the conveyance to her in 1966, Helen testified that she paid nothing in 1977, and the conveyance must have been motivated by considerations of love and affection. She had no prior conversation with Clara about the transfer. Since Clara was incompetent at trial, she did not testify. However, Doris Thacker, Orville's sister, testified that she was present when their mother quitclaimed her remaining interest to Helen. When asked if there was any discussion with her about the reasons Clara had, Doris responded, "She was at that age when she felt it was time that she should make amends as to Helen and to get her affairs straightened out." She added that Clara never indicated she was conveying the property for Orville's benefit nor for the purpose of keeping from Erma and her children any benefit from the property.

Finally, with regard to Helen's conveyance to the Neatherys, Orville testified that he did not know what Helen did with all of the $17,500 purchase money but he knew some of it was used to purchase a savings bond in an amount unknown to him. Helen did not testify specifically about this matter. The bond was not purchased in his name nor was any of the money deposited in the joint account with Helen. He said he did not receive any direct benefit from the Neatherys' purchase money but probably received some benefit indirectly. Geneva Neathery testified that although she knew of each of the previous conveyances, she really did not know much about Orville and Erma's money dispute. She testified that at the time of her purchase she was not aware that there was any claim by Erma that the property had originally been conveyed to defraud her. The Neatherys both testified that they relied on good title from Helen. A title examination prior to their purchase revealed clear title in Helen. Geneva testified that they would not have purchased the two lots had she known otherwise.

Throughout their various pleadings, defendants asserted the equitable defense of *laches*. They also raise it as an issue on appeal. Defendants argue that plaintiffs' lack of diligence in prosecuting this cause is manifested by their sitting idly by while $500 monthly arrearages accumulated over 10 years, the subject property gradually increased in value and the property was transferred and improved over the years while they waited to file suit until defendants' "crucial wit-

ness" became incompetent to testify. Defendants would have us believe that plaintiffs' behavior in these respects was calculated and designed to ensure victory in the trial court. We do not believe the record supports this reasoning, nor do we believe the doctrine of *laches* is applicable to this situation.

■■ Since plaintiffs' claim is based on allegations of fraud, we think they were required to file their complaint no earlier than the date when they first acquired knowledge of circumstances upon which the alleged fraud is based and not when they may have had knowledge of any of the several conveyances without knowledge of significant additional facts. It was not until the series of hearings in early 1979 that plaintiffs learned about the details surrounding the conveyances. They discovered that neither Clara nor Helen had paid value for their respective interests, that income from the property was being used in part for Orville's benefit after 1977 and that Orville did not have assets other than the subject property.

■■ Although a substantial lapse of time has occurred since the original conveyance at issue, the record does not establish lack of diligence. Erma testified that she requested money from Orville on his infrequent visits from October 1964 to September 1965. She attempted to enforce Orville's obligation regularly through the Department of Public Aid, legal aid and the State's Attorney's office. She made diligent efforts to acquire Social Security benefits for her children by virtue of Orville's disability. She caused a *mittimus* to issue for his arrest in 1972. Contempt proceedings were pending against Orville from 1959 to 1979 for nonsupport as well as failure to produce financial records of income, during which time he continuously lived out of State. These proceedings are all related to the very child support Erma is now trying to collect under the 1979 judgment. Only after Orville submitted himself to the court's jurisdiction in 1979 and testified about the conveyances did all of the above facts become apparent. The instant suit was filed within several months after these facts were made known to plaintiffs. We cannot say that defendants have met their burden of proving the equitable defense.

Plaintiffs have assigned numerous errors which can be conveniently grouped into one central issue: Do the circumstances before us establish a fraud perpetrated upon Erma's marital rights? The trial court found that the burden was on the plaintiffs to prove clearly that the initial conveyance was made with the specific intent to defeat Erma's right to receive support for their minor children. The evidence as presented, said the court, was such as to create a doubt as to Orville's intention at the time of the conveyance but concluded that sus-

picious circumstances were not sufficient to show clearly that it was made with the specific intent required. Consequently, plaintiffs' claim was denied. We are of the opinion that the burden of proof was improperly assigned to plaintiffs and are further of the opinion that defendants failed to rebut the presumptive fraud created by the initial conveyance.

■ With respect to her marital rights, the law affords the same protection to a wife as it does to a creditor, and it is generally held that a disposition of property made with specific intent to defeat such rights may be set aside. (See *Laterza v. Murray* (1954), 2 Ill. 2d 219, 117 N.E.2d 779; *Deke v. Huenkemeier* (1919), 289 Ill. 148, 124 N.E. 381.) We agree that plaintiffs are in a position not unlike that of continuing creditors by virtue of their relationship as wife and children of Orville. Plaintiffs' right to receive support accrued by reason of the 1959 marriage at which time, the evidence proves, two children had already been born of Erma and Orville. Orville's obligation to support these children was not contingent upon the judgment of any court directing him to provide such support. The 1967 temporary order and the 1969 divorce decree, however, provide conclusive evidence of the amount of support required. Further, the decree is conclusive evidence of his desertion of his family in October of 1964. We are persuaded that plaintiffs should be afforded the same protection as that which would be afforded a creditor under similar circumstances.

Regarding Erma's relationship to Orville:

> "There are two distinct classes of cases whereby a conveyance by a debtor may be set aside as fraudulent vis-a-vis creditors. When there is consideration for the conveyance, the creditor must prove that there was an actual intent to defraud, hinder, or delay creditors. In those cases where there is no consideration, or a grossly inadequate consideration, the transfer is deemed to be voluntary. If it appears that the rights of creditors directly tend to be or are impaired, the question of actual fraud or fraudulent intent is immaterial. The fraud is presumed from the circumstances. The principle involved is that one must be just before he is generous. If the transfer impairs the rights of creditors, this principle is violated and there is what is usually referred to as a 'fraud in law.' Birney v. Solomon, 348 Ill. 410, 181 N.E. 318 (1932); Wilkey v. Wax, 82 Ill. App. 2d 67, 225 N.E.2d 813 (1967); Second Nat. Bank of Robinson v. Jones, 309 Ill. App. 358, 33 N.E.2d 732 (1941)." (*Till v. Till* (1967), 87 Ill. App. 2d 358, 360-61, 231 N.E.2d 641, 642-43.)

See also *Thompson v. Williams* (1955), 6 Ill. 2d 208, 127 N.E.2d 457;

*Montgomery Ward & Co. v. Simmons* (1970), 128 Ill. App. 2d 186, 261 N.E.2d 555.

■■ Moreover, where a husband makes a voluntary conveyance to his wife and afterward becomes insolvent, the burden of proof is on him to disprove the implication of fraud as to creditors at the time of making the conveyance. (*McKey v. McKean* (1943), 384 Ill. 112, 123, 51 N.E.2d 189, 194; *Dillman v. Nadelhoffer* (1896), 162 Ill. 625.) A similar situation is presented here with regard to a voluntary conveyance from a son to his mother for a grossly inadequate consideration. Not only does this relationship excite suspicion, but plaintiffs' evidence proved that the very conveyance at issue was made at a time when Orville's assets consisted solely of that property and his equitable interest in his home in Texas which he attempted to place in his son's name at approximately the same time. These two transfers rendered him insolvent. Erma's rights were clearly placed in jeopardy. The debt allegedly owed to his mother equal to the value of the property, according to his testimony, was undocumented. We cannot consider such testimony, nor Helen's general assertion that he owed his mother money, sufficient to overcome the implication of fraud. "[T]he law requires in cases of this nature that the proof be clear and satisfactory that the [creditor] has a valid, subsisting debt and where the debtor is thereby rendered insolvent by the preference, the burden of disspelling the implication of fraud as against the pre-existing creditors is upon the debtor and his grantee." (*Thompson v. Williams* (1955), 6 Ill. 2d 208, 214, 427 N.E.2d 457, 471.) We can infer from the evidence present that Clara's testimony in this regard would have been cumulative and of no substantial import. That Orville paid temporary support from 1967 to 1969 under court order and under threat of citations for contempt has little bearing on his alleged good intentions to provide for future support at the time of the conveyance. Nonetheless, as stated in *Birney v. Solomon* (1932), 348 Ill. 410, 415, 181 N.E. 318, 320, "[w]hat may be in the mind of the grantor when he makes a voluntary conveyance to his wife or child [or mother] is immaterial, for if it results in hindering, delaying or defrauding creditors it must be regarded as fraudulent. A donor may make a conveyance with the most upright intentions, and yet *** it may be set aside as fraudulent. [Citations.]"

■■ The burden of proof in this case was shifted to the defendants when plaintiffs were able to prove in their *prima facie* case that the initial conveyance was for no consideration, or a grossly inadequate consideration if we accept the consideration recited in the deed, and that by the conveyance, and especially a conveyance to another family

member, Orville was left with insufficient assets to meet his obligation to support his children. The presumption of fraud has not been overcome.

■ The conveyance in 1965 from Orville to Clara has been established as fraudulent in law as to Erma's marital rights. The evidence, however, failed to sustain fraud in fact, that Orville maintained a specific intent to deprive Erma of her marital rights; that Clara and Helen participated with fraudulent intent; or that Neatherys were anything but *bona fide* purchasers for value. Accordingly, these equities must be recognized. A transfer of property fraudulent and void as to creditors is nevertheless valid as between the parties thereto. (*DeMartini v. DeMartini* (1943), 385 Ill. 128, 52 N.E.2d 138.) The initial conveyance was valid as between Orville and Clara. Likewise, each subsequent conveyance was valid as between the grantor and grantee. The fraud in law related to Erma's right to receive support. She did not lose that right because of the transfers, nor were Helen, Clara or the Neatherys obliged to acknowledge Erma's rights by renouncing ownership or forebearing purchase, absent proof of fraudulent intent. Her judgment may be enforced against the current title holder to the same extent as it might have been had the property remained in Orville's hands all along. Therefore, this cause is remanded for entry of an order establishing a lien on the subject real estate in favor of Erma for the amount of the judgment, less $2,000, and less that portion purchased and improved by Neatherys, and for whatever proceedings are necessary for the execution of the judgment. Interest on the judgment is to be awarded to plaintiffs.

Plaintiffs pray finally for attorney fees under section 508(a)(2) of the Illinois Marriage and Dissolution of Marriage Act. (Ill. Rev. Stat. 1981, ch. 40, par. 508(a)(2).) The statute provides for discretion to be exercised by the court. Plaintiffs have not persuaded us that the court abused its discretion in denying their motion. Nor are we persuaded that it would be equitable to award additional fees to plaintiffs after considering the financial resources of the parties now.

The judgment of the circuit court of Montgomery County is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

JONES and KASSERMAN, JJ., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE KARNS delivered the opinion of the court:

■ Defendants have called our attention to what they perceive to be an ambiguity regarding the lien imposed on the property. Helen does not own two lots in joint tenancy with the Neatherys; however, this oversight does not affect our disposition. Helen presently holds record title to the entire parcel except for two lots which she sold to the Neatherys in 1977. Regardless of the amount of acreage retained by Helen, the lien is to attach to the property she holds, or proceeds therefrom, if susceptible to tracing or identification. (See 37 C.J.S. *Fraudulent Conveyances* sec. 278 (1943).) The Neatherys are protected as *bona fide* purchasers, and as such their property is not subject to attachment to enforce the judgment for child support. See, *e.g., Lyon v. Moore* (1913), 259 Ill. 23; see also Ill. Rev. Stat. 1983, ch. 59, par. 5.

JONES and KASSERMAN, JJ., concur.